IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| DILCIA SANTOS, as next friend of | ) | |
| O.G.L.S., a minor; and DILCIA SANTOS, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action. No.: 5:17-cv-00020 |
| | ) | |
| TIMOTHY J. SMITH, Executive Director, | ) | By: Elizabeth K. Dillon |
| Shenandoah Valley Juvenile Center, *et al*, | ) | United States District Judge |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION**

This case involves a petition for writ of habeas corpus brought under 28 U.S.C. § 2241.

The petitioners are seventeen-year-old O.G.L.S. and his mother, Dilcia Santos. O.G.L.S., who is

a citizen of Honduras, is currently in the care and custody of the Office of Refugee Resettlement,

a division of the United States Department of Health and Human Services. He entered the

United States without inspection on or around December 15, 2014, and was found by U.S.

Border Patrol agents at the border in Brownsville, Texas. (Petition ¶¶ 13, 14, Dkt. No. 1; Mem.

Supp. Pet. (Mem.) Ex. E, Dkt. No. 7.) At that time, he was determined to be an unaccompanied

alien child (UAC), a determination that petitioners do not challenge. Consistent with the

statutory scheme designed to house and process UACs, O.G.L.S. was transferred to the custody

of ORR several days later and has been in ORR's care and custody since.

Within days of her son's arrival in the United States, Ms. Santos, who has lived in the

United States for more than a decade, filed a petition with ORR, asking to be reunified with her

son. ORR denied her petition and all of her subsequent requests for reconsideration. O.G.L.S. is

currently being housed at the Shenandoah Valley Juvenile Center (SVJC), which is a secure

1

facility in Staunton, Virginia, within this judicial district.  Ms. Santos and O.G.L.S. allege that their procedural and substantive due process rights have been violated by respondents, and they seek O.G.L.S.'s immediate release from SVJC and ORR custody to the care of his mother.

As discussed herein, based on a number of different factors, the court concludes that O.G.L.S.'s procedural due process rights have been violated, and so the court orders his immediate release to his mother.

## I. BACKGROUND

### A. Factual Background[1]

O.G.L.S. lived with his mother in Honduras until he was about five years old.  He and his mother were both physically abused by his father while he was a young child.  When O.G.L.S. was five, his mother fled Honduras and came to the United States, leaving him with relatives.  In an affidavit, she testified that she left him in Honduras because she was "afraid the trip to the U.S. would be too difficult and dangerous for him at a young age" and because she knew that "some people don't survive."  (Reply Ex. C, ¶ 16, Dkt. No. 25.)  She now lives in Kentucky, is married, and takes care of O.G.L.S.'s three half-siblings, all of whom were born in the United States.

As respondents' counsel acknowledged at the hearing, anyone with knowledge of O.G.L.S.'s background would agree that he "has not had a very good chance at life yet."  Indeed, he has experienced significant trauma in his short life.  After his mother left Honduras, O.G.L.S. endured severe physical abuse and neglect at the hands of some of his relatives.  By the time he was twelve years old, he was living occasionally with those relatives, but mostly on the streets or

---

[1]  Much of the record in this case is under seal, both because O.G.L.S. is a minor and because of the sensitive nature of much of the information pertinent to ORR's decision to deny reunification.  By way of example, this information includes allegations of criminal wrongdoing or disciplinary problems by O.G.L.S. and also detailed psychological reports.  In this opinion, the court purposefully has omitted a fair amount of detailed information in an effort to maintain O.G.L.S.'s privacy.

staying with friends, and he was often dependent on gangs for both protection and daily necessities. After a gang member befriended him and encouraged him to join the gang, that gang exerted significant coercion to get O.G.L.S. to join and stay in the gang, including physical violence against him and severe physical violence perpetrated against others in his presence. He has admitted to both using illegal drugs and selling drugs as part of his gang activity. Also, while in ORR custody, he described to his caseworker his involvement in other significant and serious criminal activity as part of that gang, although months later he recanted those statements. He has steadfastly maintained since then that he did not engage in the most serious of that conduct. Since coming to the United States, he has repeatedly and consistently told people that he wanted to leave the gang and flee Honduras, but that he was afraid to do so.

During the time he was in Honduras, he had regular (at least weekly) telephone contact with his mother. His mother also sent money for his support. (Reply Ex. C, Santos Aff. ¶ 17.) According to O.G.L.S., once his mother learned of the abuse he was suffering, she pleaded with her relatives to use other, non-physical means of discipline, but because she was not physically present, her pleas apparently had no effect. (Reply Ex. E, O.G.L.S. Aff. ¶ 10; *see also* Mem. Ex. N at 3 (home study evaluator reporting Ms. Santos's comments to the same effect).)[2]

When he was 14 years old, O.G.L.S. fled Honduras and entered the United States, planning to join his mother in Kentucky. He entered without inspection and was apprehended almost immediately. Because he entered the United States alone, he was considered a UAC, a minor with no lawful immigration status whose parents are unavailable "to provide care and physical custody." 6 U.S.C. § 279(g)(2)(C)(ii). UACs are required to be transferred within 72

---

[2] References to exhibit page numbers refer to the page assigned by the court's electronic docketing system. For example, the cite to page 3 of Exhibit N, which is Dkt. No. 7-14, is to page 3 of Dkt. No. 7-14, although it is to page 2 of the report itself.

hours to the care of ORR, and O.G.L.S. was transferred to ORR custody, where he has remained since.

In March 2015, O.G.L.S. made the disclosures referenced above concerning his criminal activities while part of the gang. As a result of these disclosures, ORR transferred him to a "staff-secure program," Heartland International Youth Center. One week later, he was transferred to SVJC Secure, a "secure program," where he has been since March 13, 2015. Two months later, O.G.L.S. recanted those earlier admissions—first to his mother and then to a counselor—and he has consistently maintained that he did not engage in that conduct. He also has submitted an affidavit in this case to that effect. (Reply Ex. E, O.G.L.S. Decl., ¶¶ 38–44, 50, 52, 57.) He has continued to maintain that his recantation is the truth and that his initial "confession" about his activities was not true.

Since he has been in ORR custody, O.G.L.S. has had some behavioral problems. Although there have been a number of "significant incident reports" (SIRs) that involved him, some of them involved his reports of his gang conduct or a concern over self-harm (which his clinician ultimately determined was not grounds for any serious concern). Still others involved incidents in which he was a victim of assaults by others or in which he avoided involvement in physical altercations or removed himself from them. Petitioners admit, though, that over the course of O.G.L.S.'s time in ORR custody, seven reports involved him in physical altercations with staff or other juveniles, although some of those were instigated by peers. (*See* Resp. Ex. 1, at 5, 13, 16, 27, 34–36, 54, Dkt. No. 21.)

One of these incidents also resulted in criminal charges being brought against O.G.L.S. in juvenile court, but the charges were later dismissed in their entirety. In the dismissal order, the

state court noted its belief that O.G.L.S. was "adversely affected by 2 years in juvenile detention" and that "he is a law abiding asset to society."[3] (Resp. Ex. 4, at 2.)

Ms. Santos filed a family reunification application with ORR on December 18, 2014, two days after her son was apprehended. (Mem. Ex. F.) She included a copy of his birth certificate, verifying that she was his mother. (*Id.*) In response, ORR conducted a psychological evaluation of O.G.L.S. It also contracted for a home study of Ms. Santos's home, which resulted in a report dated March 3, 2015. (Mem. Ex. N.) That report recommended reunification, specifically noting that "Ms. Santos [and her husband] will be positive influences on minor, and that he should be released to their care." It recommended a safety/transition plan to address both the trauma in his home country and his admission of the significant criminal conduct (which he had not yet recanted), and it said that any concerns his psychiatrist had should be shared with Ms. Santos prior to his release.

Two days later, a brief update was added to the report that, despite his transfer to a higher-security facility, the "positive recommendation for release to [Ms. Santos] has not changed." The update recommended, though, that O.G.L.S.'s clinician at his new placement "assess when it is clinically appropriate" for him to be released to Ms. Santos and further recommended post-release services.

Despite the completion of the home study report in March 2015, the ORR did not issue a decision or respond to Ms. Santos's request for reunification until May 31, 2016, more than 17 months after her petition was filed, and more than 14 months after the home study was completed. (Mem. Ex. G.) The denial was a brief letter that stated in general terms the

---

[3] Respondents argued at the hearing before this court that the state court did not have the entirety of O.G.L.S.'s record before it and that the judge's opinions are largely irrelevant to ORR's determination. But they also acknowledged that several reports in his ORR record suggest that at least some of his behavioral issues were related to his continued detention at the juvenile facility. (*See, e.g.,* Mem. Ex. U, at 4; Ex. T, at 2; and Ex. B, at 7.)

information that had been reviewed, and then gave three one-sentence reasons for the denial: that O.G.L.S. "poses a safety risk to the community"; that "he requires an environment with a high level of supervision and structure that [she is] unable to provide at this time"; and that Ms. Santos was "unable to identify a care plan that would ensure the care and supervision necessary" for his safety and well-being. (*Id.*)

In June 2016, Ms. Santos timely requested reconsideration (Mem. Ex. H), which was denied approximately four months later. The denial discussed some of the general legal standards applicable to ORR's decision, noted the three reasons for the initial denial, and provided two additional sentences setting forth some additional information that the decision-maker considered or noted. This information included O.G.L.S.'s self-reported gang involvement, his behavior while in care, and stated that he had since been "convicted of three felony assault and battery charges for assaulting staff." (Mem. Ex. I.) This latter fact was untrue. At the time of that denial (November 4, 2016), there were charges pending against in O.G.L.S. in juvenile court, but he never was convicted and those charges were later dismissed in their entirety. That denial letter offered Ms. Santos the opportunity to review case file documents if her son provided a release and also invited her to submit any additional materials and any response by December 5, 2016.[4]

Once again, Ms. Santos submitted a response to the denial. (Mem. Ex. K.) This response was detailed and cited specific portions of her son's file, now that at least some of it had been made available to her. Her response also pointed out the error concerning the alleged convictions. (*Id.*) Approximately two weeks later, ORR again denied her request for

---

[4] Although dated November 4, 2016, the letter was sent in an envelope postmarked November 30, 2016. (Mem. Ex. J.) At this point, Ms. Santos had the benefit of counsel and was able to seek an extension of time to respond given the late mailing. She filed a response on January 4, 2017, which ORR apparently deemed timely. (Mem. Ex. K.)

reconsideration. The letter was virtually identical to the November 4, 2016 denial, and even continued to include the erroneous statement that O.G.L.S. had been convicted of three felony assault and battery charges. It also reiterated that O.G.L.S. "continues to require an environment with a high level of supervision and structure that you are unable to provide at this time and his custody is required to ensure the safety of others." (Mem. Ex. L.) It noted, though, that ORR had adopted a new policy on Review and Reconsideration of Release Denials and stated Ms. Santos should contact the Office of the Director at ORR if she wished "further review of [her] case in accordance with the new policy." (Mem. Ex. L, at 3.)

She then requested an in-person hearing. After the hearing held by this court and in response to the in-person hearing request, the ORR again denied release without a hearing in a May 25, 2017 letter, albeit in a more detailed fashion than previously provided. (*See* Status Report, Dkt. No. 29-1.) Specifically, this letter emphasized O.G.L.S.'s substance abuse and other counseling needs, strongly implying that his needs were better met by ORR than by his mother. It did not explain, however, why she could not provide these services. The denial also reiterated ORR's position that O.G.L.S. poses a risk to others.

At this point in time, O.G.L.S. has been held for more than 29 months, spanning years that are a crucial time in a young person's development. The parties agree that, throughout the time O.G.L.S. has been in ORR's custody, many people have advocated for his release to his mother. For example, ORR appointed O.G.L.S. a child advocate, who serves as a sort of guardian *ad litem* for him, recommending what the advocate believes is in his best interest in terms of placement and services. In a report dated August 10, 2015, the child advocate recommended that he "be reunified without delay to his mother, with the appropriate follow-up services." His child advocate has continued to recommend reunification, as have others,

including a physician who has examined him. (*See* Mem. Ex. U (summarizing recommendations as of July 2016).) There are also reports, however, that suggest reunification should not be immediate or that recommend denial of reunification because of the concern that O.G.L.S. may present a danger to others. So, there is not unanimity of opinion on the issue, although the vast majority of reports certainly support reunification.

## B. Procedural Background

The habeas petition in this case was filed by Ms. Santos, both in her individual capacity and as the next friend of O.G.L.S. She named as respondents Timothy J. Smith (the Executive Director of the SVJC, Cristina Casado (ORR/DCS Program Manager at SVJC), Scott Lloyd (Director of ORR),[5] and Thomas Price (Secretary of DHHS).

The petition asserts three counts: (1) Ms. Santos's "constitutional claim to family unity" as a mother, brought in her individual capacity; (2) O.G.L.S.'s constitutional claim to family unity; and (3) O.G.L.S.'s "constitutional claim to liberty." All of the counts are premised on alleged violations of substantive and procedural due process under the Fifth Amendment. (*See generally* Dkt. No. 1.) In the prayer for relief, Ms. Santos requests that the court declare unlawful ORR's continued detention of, and custody over, O.G.L.S. and order his immediate release to her custody. She also requests costs and attorney's fees. (*Id.* at 6.)

The parties agreed to an expedited briefing process and have fully briefed the issue and provided numerous exhibits for the court's consideration. On May 16, 2017, the court held a summary hearing pursuant to 28 U.S.C. § 2243, although the parties presented no additional evidence at that hearing, only argument. *See* 28 U.S.C. § 2246 (allowing evidence to be taken by affidavit); *Hamdi v. Rumsfeld*, 542 U.S. 507, 526 (2004) (discussing 28 U.S.C. §§ 2243 and 2246

---

[5] Kenneth Tota, who was the acting director of ORR, was named in the petition, but Lloyd was substituted pursuant to Fed. R. Civ. P. 25(d) when he became the new director. (Order of Substitution, Dkt. No. 28.)

and explaining that "the simple outline of § 2241 makes clear both that Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts and that courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process"). At the hearing, the parties agreed that the court could consider the various exhibits attached by the parties to their briefing when ruling on the petition, with one exception. Specifically, respondents stated that they did not believe the court should consider the declaration of Hayley Cleary, which provided what is essentially expert testimony concerning the academic research and literature regarding risk factors for false confessions. (Reply Ex. I.) The court gave respondents seven days from the date of the hearing to provide a supplemental brief on this issue, but no additional brief has been filed and the time for doing so has passed. Accordingly, the petition is now ripe for disposition.

## II. DISCUSSION

### A. General Legal Principles

The Fourth Circuit has recently addressed several of the issues raised in this case. *D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) (*Cardall*). The *Cardall* court's discussion included an overview of the legal framework that governs the care and custody of UACs, including a discussion of the historical development of that framework. *Id.* at 731–34. Rather than repeat the details of that framework here, the court assumes the reader's familiarity with it. Briefly summarized, though, the government's obligations concerning the care and custody of UACs stem from two primary sources. First, there are two statutes that address those obligations: 6 U.S.C. § 279 and 8 U.S.C. § 1232, the latter of which was amended in 2008 by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Second, ORR is bound, subject to changes in the applicable statutes, to abide by a court-approved

settlement agreement in a class action suit that was brought initially by several juvenile aliens in INS custody (the *Flores* agreement). *Cardall*, 826 F.3d at 732.

Among other obligations, ORR must place a UAC in the "least restrictive setting that is in the [UAC's] best interests" and must review monthly placement decisions of any UAC in a secure facility. Pursuant to the *Flores* agreement and the TVPRA, ORR should release to a parent, if available, but only if ORR determines "that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(b)(3)(A).

This court also has the benefit of the Eastern District of Virginia's analysis after the Fourth Circuit remanded the same case. *Beltran v. Cardall*, __ F. Supp. 3d __, No. 1:15-cv-745, 2016 WL 6877305 (E.D. Va. Nov. 22, 2016) (*Beltran*). Although there are some factual differences between the *Beltran/Cardall* case and this case, and although respondents assert that the district court's decision on remand was incorrect, both opinions in that case are a focal point of the parties' briefing here. So, the court discusses them in some detail before turning to the petition before it.

Unlike O.G.L.S., who was stopped at the border trying to enter the country and reunite with his mother, the minor in *Beltran* had entered the United States illegally with his mother when he was five years old, and he had lived in the United States for approximately eight years. During that time, his mother became a lawful permanent resident, but the minor's immigration status was never adjusted. Instead, he had been granted deferred action as a derivative beneficiary of his mother's petition. In 2013, he ran away from his mother's home and began helping others smuggle undocumented immigrants from the Mexican border into the United States. He was arrested while performing that job and, when he called his mother after his arrest, she told the Border Patrol agent of his immigration status and said she had his papers. She got in

the car with the papers, but the agent called back and told Beltran to go home because the Border Patrol had decided to detain her son and send him to a youth shelter. She alleges that when she insisted she had the appropriate papers, the agent threatened to arrest her if she showed up. So, at that time, she returned back home. *Id.* at 725–26.

The Border Patrol decided that the minor in *Beltran* was a UAC, and transferred him to ORR custody. *Id.* at 726–27. Like Ms. Santos here, Beltran filed a family reunification request. After the completion of a home study, the home study recommended against releasing the minor to Beltran, concluding that the mother's home "did not appear to be a safe and stable environment," noting the high risk of recidivism posed by the minor and stating that the mother was unable to provide a safety plan for him. *Id.* at 727. Subsequent requests for reconsideration were also denied. *Id.* The immigration proceedings against him were later terminated because he had already been granted deferred action. *Id.* at 728. Thus, he simply remained in ORR's custody.

In the initial habeas proceeding, the district court rejected the mother's statutory and constitutional claims and denied her request for habeas corpus relief. *D.B. v. Poston*, 119 F. Supp. 3d 472 (E.D. Va. 2015). On appeal, the Fourth Circuit concluded, as a threshold issue, that § 2241 was the proper vehicle for bringing Beltran's challenges to her son's custody. It reasoned that the issues pursued by her "on behalf of her son" fell within "the traditional scope of § 2241 habeas corpus review." *Id.* at 731.

After discussing the legal framework governing the care and custody of UACs, *id.* at 731–34, the *Cardall* court turned to Beltran's statutory contentions, none of which are pertinent here. It then turned to her constitutional claims. It noted first that Beltran's substantive due process claim invoked the "fundamental rights strand of substantive due process." *Id.* at 740.

Specifically, she contended that ORR's "refusal to release R.M.B. to her custody impermissibly interfered with his fundamental right to family integrity." *Id.* The government disagreed that a fundamental liberty interest was at issue, relying on *Reno v. Flores*, 507 U.S. 292 (1993). *Id.*

The *Cardall* majority agreed with Beltran that the proceeding involved the fundamental "interest of parents in the care, custody, and control of their children." *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). But it ultimately rejected her substantive due process claim on the grounds that such claims have been allowed in this context only where a challenged statute allowed a state to override the decisions of *fit* parents. Beltran had already been determined by ORR to be incapable of providing for her son's physical and mental well-being and thus "[t]hat determination suffices to address any substantive due process concerns." *Id.* at 741. The court reasoned:

> when a state's interference with parental control is predicated on a determination that the parent is unable to provide adequate care for a child, such interference does not contravene substantive due process, at least in the absence of governmental action that shocks the conscience. *Cf. Troxel*, 530 U.S. at 68, 120 S.Ct. 2054 (explaining that "there is a presumption that fit parents act in the best interests of their children" (emphasis added)).

*Id.*

Lastly, the court addressed the claim that Beltran's son had been denied his right to procedural due process because ORR failed to provide him with a proper hearing before a judge or some other "impartial, competent adjudicator." *Id.* The district court had reasoned, relying on *Flores,* that the hearing the minor had before an immigration judge was sufficient process. It had also concluded that the procedures provided by ORR were sufficient to satisfy constitutional scrutiny. Noting factual distinctions between *Flores* and the case before it (including that there were no immigration proceedings against Beltran's son and that he was seeking release to a

parent, while the *Flores* plaintiffs were seeking to be released to unrelated adults), the Fourth Circuit concluded that the district court erred in ruling that the minor's claim failed under *Flores*. Additionally, the Fourth Circuit rejected the district court's determination that the available family reunification request procedures were sufficient due process, although it likewise rejected the contention that due process automatically required "a more substantial hearing." *Id.* at 743. Instead, the appellate court remanded to the district court to allow it to apply, in the first instance, the proper legal framework for measuring the process due: the three-factor test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Cardall*, 726 F.3d at 743.

Under that framework, the three factors that the court must consider are: "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements." *Id.* at 742 (quoting *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011)).

On remand, the district court applied the *Mathews* test and concluded that ORR's family reunification procedures did not provide R.M.B. or his mother due process of law. Thus, the court granted the petition and ordered R.M.B.'s immediate release. *Beltran v. Cardall*, No. 1:15-cv-745, 2016 WL 6877035, at *1 (E.D. Va. Nov. 22, 2016). In doing so, the court made a point to "emphasize the narrowness of its holding." *Id.* at 11. Specifically, it stated that its analysis was "confined to RMB's case, which Respondents assure the Court is unique." *Id.*

The parties disagree about the extent to which the *Beltran/Cardall* case should control the outcome here. Petitioners contend that the court should follow the reasoning of the district court in its opinion after remand, and respondents focus on the factual distinctions between that case and this one. Before discussing those issues in the context of evaluating the due process claim

13

here, the court must address several threshold questions concerning the proper parties in this case.

**B.  Is Ms. Santos a Proper Petitioner?**

Respondents contend that Ms. Santos may not bring a claim on her own behalf as part of a § 2241 petition, and the court agrees.  While she may be able to file a separate civil action asserting such claims and seeking injunctive relief and/or damages, a general requirement of a § 2241 petition is that the petitioner be in custody.  Ms. Santos is not.  As all parties agree, she may pursue a claim on behalf of her son in her role as her son's next friend and may challenge his detention on constitutional grounds.  But because she is not in custody, she cannot bring her own claim through a § 2241 petition.  Thus, Ms. Santos's individual claim, which is set forth in Count 1, will be dismissed, and she will be dismissed from the case insofar as she seeks to bring a claim on her own behalf.

The court notes, though, that this ruling does not preclude the court's consideration of Ms. Santos's fundamental right to the care, custody, and control of her son, particularly given that the *Cardall* court expressly considered the rights of the mother before it.  This makes sense from a practical standpoint, too: the rights of both child and parent stem from the right to family unity.  The ORR's repeated denials of reunification, therefore, while resulting in only the minor's continued detention or custody, nonetheless affect his mother's rights as much as his.

**C.  Who Are the Proper Respondents?**

Respondents also argue that the only proper respondent is O.G.L.S.'s immediate custodian, Smith, and that all other respondents should be dismissed.  (Resp. 12–13, Dkt. No. 21 (citing *Rumsfeld v. Padilla*, 542 U.S. 426 (2004)).)  In *Padilla,* which involved a habeas petition brought by a U.S. citizen being detained as an enemy combatant, the court noted the proper

respondent in a federal habeas petition is generally "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."  542 U.S. at 435.  But in a footnote, the *Padilla* Court expressly declined to address "whether the Attorney General would be a proper respondent to a habeas petition filed by an alien detained pending deportation" and cited to a circuit split on the issue.  *Id.* at 435 n.8.[6]  The case at bar is neither a straightforward federal habeas petition nor an immigration proceeding, but some of the same concerns that have animated the circuit split in immigration cases are implicated here.  For example, the court in *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 723–25 (D. Md. 2016), *appeal filed*, No. 16-7665 (4th Cir.), concluded that the immediate custodian rule did not apply in an § 2241 immigration case where the court was granting relief, because applying that rule "would yield the 'impractical result' of having the immediate custodian (the Warden of a [private] detention facility) unable to grant the relief requested."  There, the court reasoned that "the relief sought can only practically be delivered by the head of the agency in charge of interpreting and executing the immigration laws."  *Id.*

Similarly here, while Smith is the equivalent of the warden where O.G.L.S. is being held, Smith houses O.G.L.S. only pursuant to a contract and apparently has no control over what hearings or other processes ORR decides to provide.  Although defendants cite to Smith's contractual obligation, pursuant to SVJC's contract with ORR, as proof that he is the necessary and only proper defendant, no party has provided a copy of the contract to the court.  Further, respondents' counsel acknowledged at the hearing that Smith would not have authority to sua sponte release a person from ORR custody absent a court order; instead, that would require a directive from ORR itself.  In light of these concerns, and particularly in the absence of evidence

---

[6]  Since *Padilla*, however, the circuit courts remain split and the Fourth Circuit has not yet ruled on this issue.  *See Jarpa v. Mumford*, 211 F. Supp. 3d 706, 723–25 (D. Md. 2016) (discussing issue at length), *appeal filed*, No. 16-7665 (4th Cir.).

as to the precise contours of the contractual relationship, the court wants to ensure that the respondents in the case will have the full authority to grant the relief ordered by the court. Accordingly, the court believes that it is appropriate to retain as a respondent Scott Lloyd, the Director of the ORR, who would be the individual who could direct that O.G.L.S. be released, consistent with this court's forthcoming order.[7]  Accordingly, the court will grant respondents' motion to dismiss Casado and Price, but will leave Lloyd in the case.

**D.  Procedural Due Process Claim**[8]

   **1.  O.G.L.S.'s status as an alien stopped at the border does not mean he has no constitutional due process rights in the context here.**

Before turning to the three-prong test set forth in *Mathews*, the court must address a threshold issue:  whether O.G.L.S. has any constitutional right to due process at all.  Respondents assert that, because O.G.L.S. was stopped just after crossing the border and had not been in the country very long, his due process rights are those proscribed by Congress in the TVPRA, and that is all the process he is due.  Essentially, they argue that he has no constitutional due process rights.[9]  Specifically, they argue that "[a]liens identified at the border who have not had any contact with the United States—even if they are subsequently paroled into the territorial United States during the resolution of their claims for admission—are not entitled to any process other than that provided by statute."  (Resp. 14 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).)

---

[7]  Lloyd also issued the most recent denial of release.

[8]  The petition itself also contains a substantive due process claim.  The focus of the petitioners' briefing was directed toward procedural due process, and counsel indicated at the hearing that the primary focus was on procedural due process.  In light of this, and because the court concludes that O.G.L.S. has shown a violation of procedural due process, it does not address his substantive due process claim.  *Cf. Cardall*, 826 F.3d at 740–41 (considering but rejecting the petitioner's substantive due process claim).

[9]  This issue was not addressed by the Fourth Circuit in *Beltran* because the facts there did not involve a minor stopped at the border, but one who had resided in the United States, ran away from home, and then was seized and treated as an unaccompanied minor.

As even petitioners acknowledge, the distinction between aliens who are stopped at the border and not yet admitted, as opposed to those physically present in the country either legally or illegally, runs throughout immigration law. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 270–71 (1990) (contrasting an alien who had just come here and not yet formed any connection to the country with those who reside here, and stating that the Bill of Rights did not confer any rights on an alien who had been in the United States for a small number of days).[10] This distinction was emphasized in *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). There, the Supreme Court stated that the Due Process Clause applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." 533 U.S. at 693. *See also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (explaining that due process applies to aliens within the U.S., even those whose presence is "unlawful, involuntary, or transitory"). But the *Zadvydas* court went on to suggest that aliens stopped at the border would not be subject to those protections, reasoning, based on the so-called entry fiction doctrine,[11] that persons stopped at the border are not physically present in the United States. 533 U.S. at 693 (distinguishing *Mezei* on this ground and explaining that there is a "distinction between an alien who has effected an entry into the United States and one who has never entered [that] runs throughout immigration law"). *See also* Devon A. Corneal, *On the Way to Grandmother's House: Is U.S. Immigration Policy More Dangerous Than the Big Bad Wolf for Unaccompanied Juvenile Aliens?*, 109 Penn St. L. Rev. 609, 656 & n.41 (2004) (suggesting that

---

[10] In *Verdugo-Urquidez*, though, the court left open the question of whether the alien might claim Fourth Amendment protection "if the duration of his stay were prolonged—by a prison sentence, for example." *Id.* at 271.

[11] The entry fiction means that even one who is stopped at the border but then detained within United States territory (or even released into the United States but never admitted) is deemed not to have entered and to have been stopped at the border. Thus, under the entry fiction doctrine, O.G.L.S. is deemed stopped at the border, and that is all that matters. The fact that he has been physically present in the United States for more than two years is irrelevant to his status under this doctrine.

the crucial distinction regarding rights is whether an alien is "deportable" or "excludable"; if deportable, they have due process protections regardless of whether the alien's presence "is lawful, unlawful, temporary, or permanent," but excludable aliens—aliens who have been refused admission—are not entitled to the same protections).  *But see Clark v. Martinez*, 543 U.S. 371 (2005)  (holding that excludable alien (Mariel Cuban) who had been ordered removed, but had no county to be repatriated to, could not be held indefinitely).

Petitioners contend, though, that the distinction has no application in the non-immigration context here, where petitioner is challenging neither his admissibility/removability nor his detention *per se*, but due process violations in the decision not to release him to his mother.  The court agrees.

The Supreme Court and lower courts have recognized that even excludable aliens are entitled to some constitutional protections outside the immigration context.  For example, the Fifth Circuit has concluded that excludable aliens have a right to humane treatment while detained and thus that due process under the Fifth and Thirteenth Amendments entitles them "to be free of gross physical abuse at the hands of state or federal officials."  *Gisbert v. United States Att'y Gen.*, 988 F.2d 1437, 1442 (5th Cir. 1993) (quoting *Lynch v. Cannatella*, 810 F.2d 1363, 1373–73 (5th Cir. 1987)).  Nor may they be punished at hard labor without due process of law. *Wong Wing v. United States*, 163 U.S. 228, 238 (1896).  Similarly, the Ninth Circuit has reasoned that although an excludable alien is not entitled to due process protection *with regard to his exclusion or admission*, that does not mean that he is categorically excluded "from all constitutional coverage, including coverage by equal protection guarantees."  *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1098 (9th Cir. 2004) (citation omitted).  *See also Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004) ("[T]he entry fiction does not preclude non-admitted

aliens . . . from coming within the ambit of the equal protection component of the Due Process Clause."); *Jean v. Nelson*, 472 U.S. 846, 873 (1985) (Marshall, J., dissenting) (explaining that "[o]ur case law makes clear that excludable aliens do, in fact, enjoy Fifth Amendment protections" and citing cases holding excludable aliens are entitled to due process protections at a criminal trial and entitled to due process from unlawful takings).

Respondents have not identified any case holding that an excludable alien minor in government custody pursuant to the government's child welfare authority has no constitutional right to due process to determine whether he should be released to his parent. Further, unlike the distinction which is set forth in the Immigration and Nationality Act (INA) between "arriving aliens" and those already present, no such distinction appears in the TVPRA, which is the statute pursuant to which O.G.L.S. is in custody. Indeed, the TVPRA directs that UACs apprehended at the border (except those from contiguous countries) shall be treated the same as those apprehended elsewhere. 8 U.S.C. § 1232(a)(3). Furthermore, Ms. Santos's rights to the care and custody of her child are also clearly affected by ORR's continued asserted custody over O.G.L.S., and she has lived in this country for more than a decade. There is no assertion by respondents that she is not entitled to due process protections.

In short, the court concludes that O.G.L.S.'s immigration status does not have any bearing on his constitutional right to family unity.[12] The court therefore believes he has due process rights in this context and is entitled to due process protections before being deprived of

---

[12] Although immigration proceedings are separate from the decisions challenged here, *Cardall*, 826 F.3d at 738 (holding that ORR's responsibility for the care, custody, and placement of UACs is not limited to the pendency of immigration proceedings), it is worth noting that O.G.L.S. continues to have possible avenues for remaining in the United States legally. Perhaps most significantly, an immigration judge granted him asylum on May 17, 2017, a decision that will become final within thirty days of that date if the government does not appeal the grant of asylum. The parties agree that, once the grant of asylum is final, he would no longer qualify as a UAC, and ORR would lose custody over him. Second, he has been granted special immigrant juvenile status. Thus, as his counsel explained at the hearing, he has been placed on a waiting list for a visa and will be eligible to apply for permanent residence status after a visa becomes available to him, although that process could take several years.

his right to family unity.[13]  Having so concluded, the court must then determine whether his due process rights have been violated.

### 2.  Applying *Mathews v. Eldrige*, O.G.L.S.'s due process rights have been violated.

At its core, due process consists of notice and the opportunity to be heard.  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (citation omitted).  The opportunity to be heard, moreover, "must be granted at a meaningful time and in a meaningful manner." *Id.*  As noted, *Mathews* requires the court to consider three factors: "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements." *Cardall*, 826 F.3d at 742 (quoting *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011)).

Turning to the first *Mathews* factor, the parties appear to agree that the private interests implicated here include both the right to family unification and O.G.L.S.'s right to liberty. Although respondents' memorandum argued that the nature of the private interest at issue is not the right to family unification, but whether O.G.L.S. should be released from the government's care and custody, counsel abandoned that line of argument at the hearing.  Instead, counsel conceded that there is a family unity right at stake here.  This is also consistent with *Cardall*. There, the court noted that "[t]his proceeding involves" the right of parents to the care, custody, and control of their children, and a child's "familial right to be raised and nurtured by [his] parents."  826 F.3d at 740.   The court further defined both interests as "fundamental." *Id.*

Respondents also suggested in their briefing that this case should be distinguished from ones in which a child is removed from his parents' home because O.G.L.S. and his mother had not been residing together for many years.  That is certainly true, and it is certainly a factor that

---

[13]  Given this finding, the court need not address O.G.L.S.'s liberty interest claim set forth in Count 3.

the court can—and will—consider in balancing the nature of the private interest.  But the court also notes that O.G.L.S. came to the United States with the knowledge and aid of his step-father (Ms. Santos's husband) in order to live with his mother.  And O.G.L.S. and his mother had a close relationship by all accounts, speaking at least weekly by telephone while they were living apart.  Moreover, almost every recommendation to ORR has recommended reunification, and the home study visit was very positive about Ms. Santos's parental fitness, as well as the fitness of O.G.L.S.'s step-father.  Thus, although the authority in which a child is removed from a home is not directly on point, this is certainly a situation where there is an existing parental relationship (although they have not resided together for years); where both minor child and parent want to live together; where the parent has the ability to care for the child, at least according to many sources; and where ORR has made the determination that they should not be reunited, primarily because of the minor's risk of harm to others and because he "remains vulnerable for a path that would be detrimental to him and to others" due to his "fragile progress."  (Status Report, Ex. A at 4 (ORR's May 25, 2017 denial letter), Dkt. No. 29-2.)  Thus, the interest in family reunification remains fundamental, even on these facts, and is deserving of significant due process protections.  That fundamental right has clearly been impacted here, and for a significant period of time.

As to the second factor, which is the comparative risk of an erroneous deprivation of the private interest with and without additional or substitute procedural safeguards, respondents argue that the risk of erroneous deprivation does not mandate a hearing or more fulsome procedure than what ORR already provides.  (Resp. 19.)  Respondents also contend that, given O.G.L.S.'s "vacillating disclosures" of his participation in violent gang activity, his mental health issues, and his significant behavioral incidents, he has failed to explain how additional

procedures would "add value to this already comprehensive process by resulting in a less erroneous outcome." (*Id.* at 20.) Basically, respondents' argument is that their decision is so amply supported by the factual record that no additional process would have changed the outcome. The court does not agree. Instead, as discussed next, the court believes that a more fulsome process, with correction of some of the deficiencies alleged by petitioners, would considerably lessen the risk of an erroneous deprivation.

Petitioners rely on the same alleged deficiencies that the *Beltran* court found. Specifically, they identify four key deficiencies: (1) inadequate disclosure of the basis for the action taken; (2) placement of the burden of proof, the burden to initiate proceedings, and the burden to disprove ORR's determination are upon the parent, rather than requiring ORR to justify its determination to deprive the parent and child of their fundamental liberty interests; (3) inordinate delay of determinations while continuing the deprivation; and (4) the absence of an adversarial hearing by a neutral decisionmaker. (Mem. 11.)

The *Beltran* court found that the petitioner was not made aware of any of the evidence or factual findings upon which ORR relied in retaining custody over the minor child and that ORR explained its reasoning for its initial decision "only in exceedingly general terms." *Beltran*, 2016 WL 6877305, at *6. The same is largely true here.

Respondents contend that the notice given here was much more detailed than in *Beltran*, and so claim that is a distinguishing factor. But while the pre-suit denial letters here—Exhibits G, I, and L—may have provided slightly more information than was given *Beltran*, overall the lack of detail is very similar. The letters here are either a single page or a page and a paragraph, and each one devotes only about two paragraphs to the specific findings and conclusions related to O.G.L.S. And, much like in *Beltran*, they talk in very general terms; they do not identify the

specific information on which ORR is relying. So, while there may have been some additional information conveyed here, relative to *Beltran*, the letters still did not give much detail.

Furthermore, as already noted, two of the denial letters specifically referenced incorrect and untrue information as part of the rationale for the denial, saying that O.G.L.S. had felony convictions for assaulting a staff member. In fact, though, and as respondents now admit, O.G.L.S. has never been convicted of any criminal offenses. The fact that it took repeated letters and a lengthy amount of time to correct this error suggests to the court that a more comprehensive—and earlier—opportunity for a hearing in which Ms. Santos and O.G.L.S. could have presented their case for reunification—could have resulted in a different outcome.

The court also agrees with the *Beltran* court that the respondents' process improperly placed the burden of initiation and persuasion on the petitioner. Respondents do not attempt here to distinguish *Beltran* on this ground, nor could they, since the process was basically the same. Moreover, the authorities cited by petitioners, although in different contexts, strongly suggest that both a restraint of liberty and a continued separation of a child from a parent require that the government bear the burden of proof. For example, in the context of both pretrial detention and civil commitment, the government must establish the necessity of detention by clear and convincing evidence. *United States v. Salerno*, 481 U.S. 739, 751 (1987) (pretrial detention); *Addington v. Texas*, 441 U.S. 418 (1979). This is no less true where the government is claiming detention is necessary due to dangerousness. *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (finding due process violation where an individual detained on grounds of dangerousness was denied an adversarial hearing in which the state had to prove his dangerousness by clear and convincing evidence); *see also* Va. Code Ann. §§ 37.2-800 *et seq.* (setting forth requirements for involuntarily civil commitment of an adult, which includes a judicial hearing in front of a district

23

judge or special justice). Likewise, where Virginia's child welfare agency seeks to keep a child away from its parent, it bears the burden of proving that a parent poses a danger of harm to the child. *See, e.g.*, Va. Code Ann. § 16.1-252.E.1; *Thach v. Arlington Cty. Dep't of Human Servs.*, 754 S.E.2d 922, 928 (Va. Ct. App. 2014).

While none of these situations are the precise context of this case, the types of process afforded when the same rights are at stake strongly suggest that, at least when a parent is requesting reunification, the burden should be on ORR to show why its continued custody of a UAC is appropriate, rather than placing that burden on the parent. The court concludes that this difference in procedure could have a profound impact on results.

This court is also troubled by the very lengthy delays in processing Ms. Santos's petition for reunification and, in particular, the extensive delay in making an initial determination. The *Beltran* court also noted that the delay in processing the family reunification request there "raise[d] due process concerns," but said the delay alone likely did not violate due process. In that case, however, there was a delay of about two months between the filing of the reunification request and the denial.[14] Here, the delay was much more egregious: petitioners waited approximately 17 months to receive a decision on the initial application for reunification (from December 18, 2014 until May 31, 2016) and no explanation for that delay has ever been offered, either to Ms. Santos or to this court.

Furthermore, during that time, the psychological reports and other reports in the record reflect a worsening of O.G.L.S.'s psychological condition in some respects. Perhaps if the reunification had been addressed more expediently, O.G.L.S. would not have had some of the behavioral problems that he has had, which ORR is now relying upon to deny reunification. This

---

[14] In that case, the reunification request was filed on January 10, 2014; it was denied in a brief letter two months later, on March 12, 2014.

delay is especially noteworthy since most of his significant incident reports—and certainly the most troubling ones—occurred in 2016, after he had been in custody for over a year. Notably, moreover, several of the psychological reports and other notes in his file refer to his behavior as likely being attributable in part to his placement at SVJC and his being kept away from his mother for such a long time. The court finds the very significant, unexplained delay in responding to the unification request to be extremely troubling and concludes that the delay, even without other procedural deficiencies, violated due process.

As to the absence of a hearing, respondents point to cases that reject "the notion that a live, trial-like hearing is the cure-all for all potential due process ills." The Fourth Circuit's opinion in *Beltran*, likewise, rejected any contention that the petitioner there was automatically entitled to a live hearing before a neutral decision-maker. But the *Beltran* court found, based on the fact-specific inquiry required by *Mathews*, that in fact a hearing was required, or at least would have made a difference. It is true that he emphasized the "narrow" scope of his decision, based on the unique facts before him, but the facts there seem very similar to the facts here, and in some ways the facts favor the petitioners even more here. In particular, the delay has been longer in this case and two of the denial letters specifically cited incorrect information (that O.G.L.S. had been convicted of felony assault and battery) as part of the rationale for the denial. The court will not seek to define the parameters of such a hearing or to state what it must look like. Under *Mathews*, it is enough that without the various deficiencies identified, and certainly in combination, a more fulsome process could have resulted in a different outcome.

To summarize, the court concludes that, had better or more process been given (especially as to the delay and the burden being on Ms. Santos to initiate and justify reunification, rather than the default rule being otherwise), the outcome could have been

different. This is particularly true where the vast majority of the people or entities ORR asked for advice on the issue recommended that O.G.L.S. be reunified with his mother, either immediately or in the short-term, after working on other goals. So, while the documents do contain some statements that O.G.L.S. could pose a risk of danger to others, overall the second factor weighs in favor of petitioners.

The third *Mathews* factor requires the court to consider the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." It cannot be disputed that ORR has a significant interest here, both in ensuring that it releases a UAC only when consistent with its statutory mandate, and also in protecting the welfare of O.G.L.S. and the public at large. Given O.G.L.S.'s admission of criminal activities while in Honduras and his behavioral problems while in the custody of ORR, which include a number of physical altercations, it is certainly reasonable, on some level, for ORR to want to keep O.G.L.S. where he cannot harm others.

But what respondents have not identified is what *burden* it would impose on ORR to provide more process to O.G.L.S. (or children like him) and parents who seek reunification with their children. In *Beltran*, ORR assured the court that the petitioner's situation was "unique." Here, respondents have not made such a statement, but they also have not identified how many individuals are in similar circumstances as O.G.L.S. so as to allow the court to identify the burden on ORR of, for example, holding hearings, making more expeditious decisions, etc. The only facts we have about this are the *Beltran* court's finding that roughly 93% of children entrusted to ORR's care in 2014 (53,518 of 57,496) were released to custodians after only a brief stay in custody and that fewer than 4,000 were in long-term custody. 2016 WL 6877035, at *10. Of those, there was no indication how many were detained over the objection of an available

parent, such that it would implicate the fundamental right involved here and in *Beltran*. The court does find it telling, though, that ORR has recently modified its policy and has indicated that it will provide appeal hearings in cases like this one. That suggests to the court that the burden would not be particularly significant.

Considering all the *Mathews* factors in combination, then, the court concludes that O.G.L.S.'s rights to due process were violated and he is thus being held in violation of law.

## E.  Remedy

Having determined that O.G.L.S.'s due process rights have been violated, the court next considers the proper remedy for that violation. The case is styled as a habeas petition and challenges O.G.L.S.'s confinement, and so O.G.L.S. seeks his immediate release to his mother. Notably, that was precisely the remedy afforded on remand in *Beltran*. The remedy sought here is an equitable remedy, and, in granting equitable relief, the court has "broad" powers, "for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). Indeed, "[i]n equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . ." *Lemon v. Kurtzman*, 411 U.S. 192, 200–01 (1973) (plurality opinion).

The court has considered whether it should give ORR additional time in which to provide more fulsome process. But that would do little to aid O.G.L.S. or to remedy the violations the court has found. O.G.L.S. will turn 18 in December and, at that point, will no longer be in ORR custody. Much like the minor petitioner in *Beltran*, to conclude that his due process rights were violated, but then allow ORR additional time to hold another hearing, would afford O.G.L.S. empty, largely meaningless relief, given the proximity to his eighteenth birthday and the lengthy delays that he and his mother have already endured as to their request for family reunification.

*See Beltran*, 2016 WL 6877035, at *11 ("Affording [the petitioners] additional process at this point would therefore be of marginal benefit.").

At the May 16, 2017 hearing, respondents' counsel explained that, subsequent to this case being filed, ORR has adopted a policy that could allow petitioners a live or video hearing before an official with the Assistant Secretary for Children and Families, which is the umbrella agency under which ORR falls.[15]  Although there was no indication when that hearing could or would be held, respondents explained that the new policy would require a decision within thirty days. Respondents requested additional time from this court to conduct that hearing, effectively suggesting that this case be stayed while that process takes place.  Petitioners countered that this decision-maker was not a neutral arbiter and that, in any event, the offer of a video conference was too little, too late.  They did not agree to a stay of proceedings to allow ORR to pursue this process.  Given the court's concern over the significant delay that has already taken place since this case was filed and the absence of any agreement on the point, the court refused to stay the case in order to allow additional process.  The due process violations have occurred and, under the specific facts of this case, cannot be cured at this point with a belated hearing.

---

[15]  On May 2, 2017, ORR Director Lloyd sent a letter to petitioners' counsel stating that he intended to review the case and that he would have an opportunity for appeal with the Assistant Secretary under section 2.7.8 of the ORR Policy Guide.  (Reply Ex. A (citing https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied).)  The same letter stated that an appeal would not provide for an in-person hearing.  But according to counsel, a hearing by teleconference or video conference is now available.  Likewise, on May 25, 2017, Lloyd denied release and advised Ms. Santos that she could request an appeal with a hearing to be held by teleconference or video conference.  (Status Report Ex. A, at 5.)

### III.  CONCLUSION

For the foregoing reasons, the court will dismiss Ms. Santos as a petitioner and will dismiss Count 1 of the petition.  The court will also dismiss respondents Casado and Price, but retains Smith and Lloyd as respondents.  Based on the court's conclusion that O.G.L.S.'s due process rights have been violated and that the proper remedy is his immediate release to his mother, the court will grant the petition as to Count 2, deny it as moot as to Count 3, and order his release.  An appropriate order will be entered.

Entered: June 1, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge